January 30, 1978

## 78-7    MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

### Applicability of Antilobbying Statute (18 U.S.C. § 1913)—Federal Judges

This responds to your request that we address the issue whether the antilobbying statute, 18 U.S.C. § 1913, prohibits sitting Federal judges from using resources associated with their official position (telephone, stationery, staff, and personal work time) to communicate with individual Members of Congress concerning pending or proposed legislation. We outline below what we believe to be the pertinent considerations and conclude that the issue is one that can only be resolved through the independent deliberations of the judicial branch.

18 U.S.C. § 1913 reads as follows:

No part of the money appropriated by an enactment of Congress shall, in the absence of express authorization by Congress, be used directly or indirectly to pay for any personal service, advertisement, telegram, telephone, letter, printed or written matter, or other device, intended or designed to influence in any manner a Member of Congress, to favor or oppose, by vote or otherwise, any legislation or appropriation by Congress, whether before or after the introduction of any bill or resolution proposing such legislation or appropriation; but this shall not prevent officers or employees of the United States or of its departments or agencies from communicating to Members of Congress on the request of any Member or to Congress, through the proper official channels, requests for legislation or appropriations which they deem necessary for the efficient conduct of the public business.

Whoever, being an officer or employee of the United States or of any department or agency thereof, violates or attempts to violate this section, shall be fined not more than $500 or imprisoned not more than one year, or both; and after notice and hearing by the superior officer vested with the power of removing him, shall be removed from office or employment.

This provision first appeared in 1919 as a rider to an appropriations bill. Act of July 11, 1919, ch. 6, § 6, 41 Stat. 68. It was one of a series of measures designed to check the expanding activities of the Federal bureaucracy not directly related to any statutory mission.[1]

No criminal prosecutions have been undertaken pursuant to this provision. The only relevant judicial interpretations of this measure provide rather superficial analyses. *See, American Public Gas Association* v. *Federal Energy Administration*, 408 F. Supp. 640 (D.D.C. 1976); *National Association for Community Development* v. *Hodgson*, 356 F. Supp. 1399 (D.D.C. 1973). The limited legislative history demonstrates that its enactment was spurred by a single, particularly egregious instance of official abuse—the use of Federal funds to pay for telegrams urging selected citizens to contact their congressional representatives in support of legislation of interest to the instigating agency. *See* 58 Cong. Rec. 403 (1919). The provision was intended to bar the use of official funds to underwrite agency public relations campaigns urging the public to pressure Congress in support of agency views.

This interpretation is bolstered by the inclusion in the measure of the following savings clause:

> . . . but this shall not prevent officers or employees of the United States or of its departments or agencies from communicating to Members of Congress on the request of any Member or to Congress, through the proper official channels, requests for legislation or appropriations which they deem necessary for the efficient conduct of the public business.

The clause provides assurance that, in keeping with well-established traditions of ongoing communication between the executive and the legislative branches (*see* N. Small, *Some Presidential Interpretations of the Presidency*, 164-166 (1970)), and the constitutional principle of separation of powers, direct communications by "officers or employees of the United States" to Congress will not be disturbed. The qualification "to Members of Congress on the request of any Member or to Congress" seems designed more to stress the individual Member's prerogative of addressing communications to non-legislative branch officials than, by virtue of the apparent dichotomy between "Members of Congress" and "Congress," to limit communications from such officials to situations in which they address Congress as a whole, or in which replies to individual Members of Congress have been authorized by a Representative's request.

. The clause does indicate that such communication is to take place "through the proper official channels." Statements made in the course of the congressional debate on a proposed, but unsuccessful, amendment to the provision

---

[1]*See. e.g.*, Act of October 22, 1913, ch. 32, § 1; 38 Stat. 212; 5 U.S.C. § 3107 (prohibition of expenditures for unauthorized "publicity experts"); Act of August 2, 1939, ch. 410; 53 Stat. 1148; 5 U.S.C. § 7324 *et al.* (Political Activity Act); Act of August 31, 1951, § 408; 65 Stat. 247 (Department of Agriculture Appropriation Act, 1952) (prohibition of unauthorized expenditures for "publicity or propaganda purposes").

suggest that this limitation was meant to assure that communications to Congress from nonlegislative officials be cleared through "their superiors, or whoever it might be," 58 Cong. Rec. 425 (1919). In effect, this would screen out communications that did not represent the views of the agency. At the same time, the right of officers and employees to petition Congress in their individual capacities, codified in the Act of August 24, 1912, ch. 389, § 6 (37 Stat. 555; 5 U.S.C. § 7102) was preserved.

The thrust of this language is to recognize the danger of *ultra vires* expressions of individual views in the guise of official statements. Congress did not define the scope of the term "official channels"; rather, it recognized the need for monitoring the opinions expressed under color of office in order to insure a consistent agency position. This difficulty is not removed by a direct solicitation of an individual official's views by a Member of Congress.

In light of the context in which the language was adopted, it is particularly inappropriate to engage in legalistic arguments as to whether a Federal judge, who lacks any direct superior, speaks "through proper official channels" whenever the judge takes a position with respect to matters of judicial concern. Instead, it must be recognized that Congress' intent was to leave to the other branches of government the determination of what internal checks and methods of clearance would be appropriate.

A number of constraints peculiar to the judicial branch may bear on that determination. Canon 4 of the American Bar Association's Code of Judicial Conduct provides, in pertinent part:

> A judge, subject to the proper performance of his judicial duties, may engage in the following quasi-judicial activities, if in doing so he does not cast doubt on his capacity to decide impartially any issue that may come before him:

> B. He may appear at a public hearing before an executive or legislative body or official on matters concerning the law, the legal system, and the administration of justice, and he may otherwise consult with an executive or legislative body or official, but only on matters concerning the administration of justice.

While Canon 4 appears to authorize certain activities, it does so only as to "matters concerning the administration of justice," and only if the judge "does not cast doubt on his capacity to decide impartially any issue that may come before him."

Constitutional constraints also need to be taken into account. The Framers considered, and rejected, several proposals that members of the judiciary serve as advisers on a "council of revision" designed, in effect, to veto improper laws, reasoning that "the Judges ought to be able to expound the law as it should come before them free from the bias of having participated in its formation." *See* 1 M. Farrand, *The Records of the Federal Convention of 1787* (rev. ed., 1966), at 98; *see also* 1 *id*. 108-110, 138-140; 2 *id*. 73-80, 298. Early in the Nation's history, the Supreme Court refused a request by President Washington for advice concerning certain legal issues growing out of American

neutrality during the war in Europe. *See* 1 C. Warren, *The Supreme Court in United States History* (Boston rev. ed., 1937), 108-111. A related concern, that the constitutional principle of separation of powers be preserved, arises in connection with the facts posed by this inquiry. Moreover, the judiciary traditionally refuses to render advisory opinions or opinions that are not final but subject to revision by the executive or legislative branches. *See, e.g., Hayburn's Case* 2 Dall., 409 (1792).

Thus, even if a judge is not acting as a judge in rendering informal advice to Members of Congress, his insistence on doing so in his official capacity may be ill-advised in light of other, more practical considerations. Just as with an executive agency, there is a need that the judiciary not be divided into a number of camps based on their varying advice to various Members of Congress. Judges must be especially careful not to be drawn into political disputes; they must remain impartial. Appearances at hearings may present different problems from those that arise in giving advice to individual Members of Congress. The result of such joint consideration of particular issues is in most instances a merger of ideas into a single, public product. A provision for more informal advice may give a judge a vested interest in the way that a particular statute is formulated, but provide no obvious identification of his connection with the provision sufficient to allow a litigating party, including the United States, to ask that he recuse himself.

Congress recognizes that only limited access to the judiciary for purposes of advice on legislation is appropriate. The statute creating the Judicial Conference of the United States, 28 U.S.C. § 331, which established a procedure for making budget estimates, 28 U.S.C. § 605, and the statute establishing a mechanism for raising problems concerning the operation of the Speedy Trial Act, 18 U.S.C. § 3165(c), all contemplate the funneling of ideas relating to legislation through that single forum. In light of Congress' own reluctance to intrude in this realm, it is particularly ill-advised for an executive agency, such as the Department of Justice, to do more than suggest that the question presented here raises issues that must of necessity be resolved internally within the judicial branch.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*